**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

JEFF ROBINSON,

      Plaintiff,

v.

UNIVERSITY OF DENVER,

      Defendant.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff Jeff Robinson by and through counsel Christopher M.A. Lujan of EMPOWER P.C., respectfully alleges for his Complaint and Jury Demand as follows:

## I.    INTRODUCTION

1.    This case involves Defendant University of Denver's discriminatory and retaliatory termination of Plaintiff Robinson's employment. The Defendant terminated Plaintiff's employment, in whole or in part, because of his status as a disabled employee with sleep apnea. When the Defendant became aware of Plaintiff's disability, it refused to provide him a reasonable accommodation that would have allowed for him to continue his successful work as a Senior Database Administrator. When the Plaintiff sought to take intermittent leave under the Family Medical Leave Act, the Defendant committed conduct that interfered with his right to take the protected leave needed to treat his sleep apnea.

Finally, the Defendant retaliated against the Plaintiff because he made the decision to provide unfavorable testimony against the University of Denver when another employee decided to file a complaint against it for discriminatory conduct.   As a result of Defendant's illegal treatment, Mr. Robinson lost his job which caused him to suffer lost wages and benefits, humiliation, loss of future employment opportunities, severe emotional distress, loss of enjoyment of life, and other significant injuries, damages, and losses.

## II.     JURISDICTION AND VENUE

2.     Jurisdiction of this Court is proper pursuant to 28 U.S.C. §§ 1331 and 1343. This action is authorized and instituted pursuant to 42 U.S.C. §12111 *et. seq.* ("Americans with Disabilities Act"), 29 U.S.C. §794 *et. seq.* ("Rehabilitation Act")*,* Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000 *et. seq.*, and the Family Medical Leave Act, 29 U.S.C. §2601 *et. seq.*

3.     Plaintiff's claim for attorney's fees and costs is proper under the enforcement provisions of the ADA, Rehabilitation Act, Title VII of the Civil Rights Act of 1964, and the Family Medical Leave Act.

4.     The employment practices alleged herein to be unlawful were committed within the jurisdiction of the United States District Court for the District of Colorado. Venue is proper in this Court pursuant to 28 U.S.C. §1391 (b).

### III.   ADMINISTRATIVE PREREQUISITES

5.      Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) and received a Notice of the Right to Sue letter from the EEOC on 14 August 2019.  Thus, all administrative prerequisites have been met.

### IV.   PARTIES

6.      Plaintiff Jeff Robinson is a citizen of the United States and a resident of the State of Colorado.  At all times referred to herein, Mr. Robinson was employed by the University of Denver.

7.      Plaintiff Robinson is an individual with a disability within the meaning of all applicable statutes, including Section 504 of the Rehabilitation Act of 1973 (Section "504"), 29 U.S.C. §794, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12111.

8.      At the time of his dismissal, Plaintiff's sleep apnea qualifies as a serious health condition under the Family Medical Leave Act ("FMLA").

9.      Defendant University of Denver ("DU") is a private university located in Denver, Colorado.  DU receives federal funding, particularly in the form of research grants.

10.     The Defendant is a covered employee under the FMLA.

### V.   FACTUAL ALLEGATIONS

11.     Plaintiff began his employment with the University to Denver in 2001 where he was hired as a Database Administrator.

12.     In approximately 2012, the Plaintiff's position was changed to a Senior Database Administrator as the result of the Defendant's decision to reorganize its' technology services department known as University Technology Services ("UTS").  The Plaintiff was moved to the Enterprise Application Services ("EAS") group.

13.     As a Senior Database Administrator, the Plaintiff's essential functions of his job included: creating, maintaining, installing, configuring, and installing servers used by DU; working closely with system administrators to implement storage and capacity planning for existing databases and applications; planning and implementing backup and recovery strategies for databases and applications; the development of appropriate audit controls and procedures to ensure the integrity of databases and applications; to analyze, consolidate, and performance tune database and applications; monitor databases and applications for availability; provide 24/7 support and on an on-call basis; provide approved modifications to databases, structures, and applications; and manage projects from beginning to completion.

14.     In 2017, the Plaintiff was scheduled to work Monday through Friday totaling 37.5 hours, not including his unpaid lunch hours each day.  Throughout his employment, a standard work week for the Plaintiff was 37.5 hours per week.

15.     The Defendant's Employee Handbook, revised in May 2013, states that employees typically work 37.5 hours a week divided into five days.  Employees are required to "clarify expected hours of work with their supervisor."

16.     Throughout 2016 and 2017, Plaintiff's supervisor was Ms. Rohini Ananthakrisnan who was responsible for overseeing Mr. Robinson's work schedule; for making decisions on Mr. Robinson's leave requests; and for providing him with his annual job performance evaluations.

17.     In 2017, the Defendant's Director of Benefits was Mr. Lloyd Moore.

18.     In 2017, the Defendant's Employee Development Manager was Mr. Greg Gieson.  Part of Mr. Gieson's job duties included the administration of leave pursuant to the Family Medical Leave Act ("FMLA).

19.     In 2017, the Defendant's Leave Administrator was Ms. Sarah Childs.

20.     In 2017, the Defendant's Assistant Vice Chancellor of the EAS was Ms. Susan Lutz.

21.     In 2017, the Defendant's Employee Relations Consultant was Ms. Molly Rossi.

22.     In 2007, the Plaintiff was first diagnosed with sleep apnea which he was able to effectively manage for years with the help of his physician.

23.     In approximately October 2016, the Plaintiff became very ill with two different and severe viruses.

24.     These illnesses related to the Plaintiff's sleep apnea.

25.     Despite these illnesses, Plaintiff utilized very little sick leave because of his fear that Ms. Ananthakrisnan would retaliate against him for requesting sick leave.  Based

on Plaintiff's observations and those of his peers, he avoided using sick leave because of her hostile behavior towards Plaintiff and other employees who requested sick leave.

26.     Throughout October 2016, the Plaintiff's illnesses became worse to the point where he suffered from severe and debilitating fatigue, severe headaches, high blood pressure, and anxiety.

27.     In October 2016, Plaintiff's physician discovered that his sleep apnea was incorrectly treated which exacerbated his symptoms.

28.     Despite his illnesses, the Plaintiff continued to perform the essential functions of his job.  Although she knew that Plaintiff was recovering from these illnesses, Ms. Ananthakrisnan continued to assign him with additional responsibilities and after hour tasks.

29.     During this time, the Plaintiff asked Ms. Ananthakrisnan if she could reassign these tasks and after-hours assignments to other EAS employees because they had the time and ability to carry out these tasks.  Ms. Ananthakrisnan denied Plaintiff's request.

30.     During this time, Ms. Ananthakrisnan was very critical of Plaintiff's work with the University's "Banner/ERP System."  When Plaintiff notified Ms. Ananthakrisnan that he was unfamiliar with the intricacies of this system and requested training on this system, she denied him training.  Because of this denial, Plaintiff used his own money to purchase books and other training material to improve his performance with this system.

31.     Ms. Ananthakrisnan granted non-disabled EAS employees the opportunity to take training in the "Banner/ERP System."

32.     During this time, Plaintiff was required to work longer hours and respond to more after hours requests for assistance than his non-disabled peers in EAS.

33.     During this time, the Plaintiff's non-disabled peers in EAS frequently ignored after hour calls for assistance despite having the time and ability to handle them.

34.      During this time, the Plaintiff was held to a higher standard than his younger, non-disabled peers which was evident in the public and private criticism he received from Ms. Ananthakrisnan.

35.     On or around 02 March 2017, Plaintiff met to discuss his sleep apnea and health issues with Ms. Ananthakrisnan.    Ms. Ananthakrisnan immediately responded that Plaintiff could not receive any accommodations because of the burden it would have on her department.   Further, she said that Plaintiff's health problems were not her problem and that he needed to speak with human resources to request additional information about his needs for an accommodation.

36.     On or around 02 March 2017, Plaintiff contacted Messieurs Moore and Gieson regarding his ability to take leave under the Family Medical Leave Act.   Shortly after, Plaintiff received paperwork from Ms. Childs regarding family medical leave.   Due to his declining health, Plaintiff scheduled an emergency visit to his physician where he was diagnosed with job-related stress and fatigue caused by his sleep apnea.   On that day,

Plaintiff was immediately placed on family medical leave which would last until 26 March 2017.

37.     While he was out on leave, Mr. Robinson contacted Ms. Rossi regarding concerns he had about retaliation from Ms. Ananthakrisnan and Ms. Lutz for taking time off.  It was at this time that Plaintiff first made Ms. Rossi aware of his fears of being retaliated against by the Defendant because of his sick leave and the impact of his disability on his job.

38.     Plaintiff's fears about retaliation are based on the advice he received from a former colleague who advised him never to bring these concerns to Human Resources' attention or else he would be fired for doing so.

39.     While he was out on leave, Plaintiff worked with his physician and care providers to manage the adverse effects of his disability and to identify the triggers which exacerbated his sleep apnea.  Plaintiff's health began to improve while he was on leave.

40.     On 27 March 2017, the Plaintiff returned to work.  The one medical restriction he had was that he could only work 37.5 hours or a full-work week with no after-hours or weekend work.  At that time, working more than 37.5 hours per week aggravated Plaintiff's sleep apnea which interfered with his ability to concentrate, breath, think, read, and successfully perform the essential functions of his position.

41.     On 27 March 2017, the Plaintiff notified the Defendant that he scheduled a surgery for 08 August 2017 because his doctors informed him that it was likely the surgery

would completely alleviate his sleep apnea and related symptoms.  The 08 August 2017 date was the soonest that the Plaintiff could schedule this surgery.

42.     The Plaintiff requested that his reasonable accommodation consist of only working his 37.5 hours schedule until he returns from his August 2017 surgery.  The Plaintiff never requested that his accommodation last for an indefinite or prolonged period of time.

43.     On 05 April 2017, the Plaintiff met exclusively with Ms. Ananthakrisnan about the status of his work projects and expectations.  At this time, Ms. Ananthakrisnan provided Plaintiff with a document titled, "Statement of Expectations" which listed her expectations but contained no substantive information of how to improve his performance.

44.     On Friday 07 April 2017, Plaintiff emailed Mr. Moore to request information for how to apply for intermittent family medical leave.  Shortly after Plaintiff made his request, Mr. Moore contacted Ms. Ananthakrisnan and notified her about his request for intermittent leave.

45.     On Monday 10 April 2017, Ms. Ananthakrisnan requested a meeting with Plaintiff where she angrily demanded that he inform her about any additional leave requests.  Based on her behavior during this meeting, Plaintiff worried about his continued employment and his ability to take intermittent leave under the Family Medical Leave Act.

46.    On 06 June 2017, Plaintiff met with Ms. Ananthakrisnan, Mr. Moore, and Ms. Lutz where they informed him that he was unable to perform the essential functions of his job because he could only work 37.5 hours.  During this meeting, Mr. Moore asked Ms. Ananthakrisnan if Plaintiff's continued employment in the EAS was "a hardship" and she responded "yes."  Ms. Ananthakrisnan provided no additional reasons why Plaintiff's continued employment was a hardship.  While Mr. Moore suggested that Plaintiff look for employment elsewhere throughout DU, the Defendant refused to further discuss his request for a reasonable accommodation.

47.    At this time, Plaintiff spoke with his peers about his health issues and they informed him that they could work after hours and on the weekend to cover for Mr. Robinson while he took time to recover.

48.    On 12 June 2017, Mr. Moore met with Plaintiff to inform him that DU was beginning the process of separating him from his job "immediately."  Mr. Moore notified Plaintiff that there were no other employment opportunities open at DU and that he could not ask additional questions regarding transfer or his continuing request for a reasonable accommodation.  At this same meeting, Mr. Moore told Plaintiff that he must meet with Ms. Rossi the following day to finalize his separation.

49.    The Plaintiff received an email from Ms. Rossi on 12 June 2017 at 4:53 p.m. to request a meeting to discuss his employment status.

50.    Based on his experience, individuals in similar situations to Plaintiff were transferred to other departments throughout DU.  Furthermore, Plaintiff is aware of the

transfer/accommodation process lasting months and even up to a year for other similarly situated employees.  Six days passed between the time that Plaintiff was told he could not perform the essential functions of his job to his meeting with Mr. Moore where he was told he was being separated from his job that he had held for sixteen years.

51.     The Plaintiff spoke with Ms. Rossi on 13 June 2017 when he notified Ms. Rossi that he wanted to continue working at DU and was hopeful that his surgery would improve his health.  At this meeting, Ms. Rossi advised Plaintiff to meet with Mr. Moore in person to discuss the status of his job.

52.     Mr. Moore advised Plaintiff in an email that he needed to have his doctor complete a medical questionnaire which Plaintiff promptly returned as requested.

53.     On 22 June 2017, Mr. Robinson was interviewed by DU EEOC Investigator Christina Valencia regarding a discrimination complaint filed by another employee. During this interview, Plaintiff advised Ms. Valencia that he feared retaliation by the Defendant for participating in this investigation.  Despite his fear, Plaintiff agreed to the interview and cooperated with the investigator.

54.     On 12 July 2017, Ms. Lutz scheduled a surprise meeting with the Plaintiff. In her request for the meeting, she did not notify Plaintiff what the purpose of the meeting was or who would be in attendance.  The meeting was also attended by Mr. Moore and Ms. Rossi.

55.     At this meeting, the issue of Plaintiff's August 2017 surgery was discussed. Mr. Moore stated that there was not enough assurance from Plaintiff's doctor about the

results of Plaintiff's upcoming surgery. The Plaintiff responded by asking what additional information was needed and whether any of the Defendant's representatives were requiring a guarantee that no additional accommodations would be needed post-surgery. Neither Ms. Lutz, Ms. Rossi, nor Mr. Moore answered any of the Plaintiff's questions.

56.    At the time of this meeting, the Defendant had no information from the Plaintiff's doctor regarding the possible outcomes of the August 2017.

57.    At this meeting, Ms. Rossi provided Plaintiff with a severance agreement and that his effective termination date was actually on 10 July 2017.

58.    As a result of his termination, Plaintiff's health care benefits were suspended in July 2017 which was shortly before he was scheduled to undergo crucial surgery to alleviate his sleep apnea. Because of his termination, Plaintiff was forced to postpone his surgery until he could secure new health care benefits and the ability to pay for his surgery.

## VI.    STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Violation of the Americans with Disabilities Act, 42 U.S.C. § 12111, *et. seq.)*

59.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

60.    At the time of his termination, Plaintiff was a qualified individual with a disability under the Americans with Disabilities Act.

61.    Plaintiff was qualified for his job as evidenced by his successful performance as evidenced in written performance evaluations of Mr. Robinson authored by the Defendant throughout his sixteen-year career at DU.

62.    As a result of his sleep apnea, Plaintiff is a qualified individual with an actual disability under the Americans with Disabilities Act.

63.     Plaintiff's sleep apnea substantially limited a variety of major life activities including working, concentrating, caring for oneself, sleeping, learning, reading, breathing, thinking and communicating.

64.    Plaintiff's sleep apnea substantially limited his ability to work in a whole class of jobs connected to information technology.

65.    On or around 02 March 2017, Plaintiff met with his supervisor Rohini Ananthakrisnan to discuss the impact of his disability on his job.  Ms. Ananthakrisnan responded that Plaintiff would not receive any accommodations because of the impact of accommodations on her department.  Ms. Ananthakrisnan regarded Plaintiff as disabled under the Americans with Disabilities Act.

66.    At this same meeting, Ms. Ananthakrisnan advised the Plaintiff that he needed to speak with a representative from human resources to request information about his needs for a reasonable accommodation.

67.    On 27 March 2019, the Plaintiff notified the Defendant that he was scheduled to undergo surgery on 08 August 2017 to alleviate the symptoms he was suffering from due to his sleep apnea.  The Plaintiff chose this date because it was the earliest he could undergo this surgery.

68.    On 27 March 2019, the Plaintiff notified the Defendant that the only reasonable accommodation he needed to perform the essential functions of his job was to only work his regular job schedule of 37.5 work hours a week.  The Plaintiff could perform the essential functions of his position during his 37.5-hour work week.

69.    On 06 June 2017, Ms. Ananthakrisnan, Mr. Moore, and Ms. Lutz notified the Plaintiff that he could not perform his job because he could only work 37.5 hours a week.  According to the Defendant, the Plaintiff's continued employment constituted a hardship on the EAS.

70.    On 12 June 2017, the Defendant notified the Plaintiff that it would begin the process of separating the Plaintiff from his job.  Shortly after, the Plaintiff notified Ms. Rossi that he wanted to continue working for DU and that he believed the surgery would improve his health.

71.    On 12 July 2017, Mr. Moore expressed concerns that Plaintiff's pending August surgery would not be enough to guarantee that no additional accommodations would be needed by Plaintiff in the future.  Mr. Moore regarded Plaintiff as disabled under the Americans with Disabilities Act.

72.    Because the Plaintiff could not guarantee that his surgery would alleviate the impact of his disability on his work, the Defendant chose to terminate Mr. Robinson.

73.    On 12 July 2017, the Defendant notified Plaintiff that his employment was terminated effective on 10 July 2017.

74.     Between October 2016 and July 2017, Plaintiff provided Defendant with documents pertaining to his disability.  The Defendant has a record of Plaintiff's disability as defined under the Americans with Disabilities Act.

75.     Because of Plaintiff's actual disability, his record of a disability, or the fact that the Defendant regarded him of having a disability, he was subjected to adverse treatment in the terms and conditions of his employment, including but not limited to termination of his employment, as detailed herein.

76.     Despite his qualifications and satisfactory job performance, Defendant terminated Plaintiff's employment, in whole or in part, because of his disability, record of disability, or being regarded as having a disability.

77.     The Defendant was aware of Plaintiff's disability and was required to provide him with a reasonable accommodation that would allow for him to perform the essential functions of his job.

78.     Despite having actual notice of Plaintiff's disability, Defendant failed to provide him with a reasonable accommodation as required under the Americans with Disabilities Act.

79.     Defendant's asserted reasons for terminating Plaintiff's employment were pretext for illegal disability discrimination.  There is no evidence that Plaintiff's inability to work more than 37.5 hours a week posed an undue hardship on the EAS.

80.     Defendant's acts and conduct were committed with malice or with reckless indifference to the Plaintiff's federally protected rights within the meaning of the Americans with Disabilities Act.

81.     Defendant is liable for the acts or omissions of its agents and employees. Defendant, either directly or by and through their agents, discriminated against Plaintiff on the basis of his disability, record of having a disability, or being perceived as having a disability.

82.     As a consequence of Defendant's illegal conduct, the Plaintiff suffered significant economic, consequential, and compensatory damages.

83.     Defendant's conduct was the proximate cause of Plaintiff's injuries, damages, and losses.

## SECOND CLAIM FOR RELIEF
### (Retaliation in Violation of the Americans with Disabilities Act, 42 U.S.C. § 12111, *et. seq.*)

84.     Plaintiff hereby incorporates all paragraphs of this Complaint as though set forth herein.

85.     Plaintiff notified the Defendant on several occasions that his disability required the aid of a reasonable accommodation in order to perform the essential function of his job.  On each occasion that Plaintiff made a reasonable accommodation, he had a good faith belief that his request was covered by the ADA.

86.     Plaintiff first notified Ms. Ananthakrisnan on 02 March 2017 that he could only work his regularly scheduled shift of 37.5 work hours a week and could not work after hours or an on-call basis.

87.     Ms. Ananthakrisnan immediately responded that Plaintiff could not receive any accommodation because of the burden it would have on her department.

88.     Plaintiff again on 27 March 2017 notified Defendant that he was undergoing surgery in August to treat his disability and again could only 37.5 work hours a week. Plaintiff requested that his accommodation last until August 2017 when he returns from his surgery.  The Plaintiff's request for a reasonable accommodation was made on his good faith belief that this request would be covered under the ADA.

89.     After notifying Plaintiff that it would not provide him with a reasonable accommodation for his disability, Defendant notified Plaintiff on 12 July 2017 that he was being terminated from his employment.  The Defendant notified Plaintiff that his termination was effective on 10 July 2017.

90.     On multiple occasions between March through July 2017, the Defendant informed Plaintiff that it would not provide a reasonable accommodation for his disability.

91.     The Plaintiff's attempts to notify his supervisors about his disability constitutes a protected activity under the ADA.

92.     The Defendant's decision to terminate the Plaintiff constitutes an adverse employment action under the ADA.

93.     The Defendant's decision to terminate the Plaintiff less than three months after he engaged in a protected activity is the temporal proximity required to show that his termination was in retaliation for engaging in a protected activity.

94.     As a consequence of Defendant's illegal conduct, the Plaintiff suffered significant economic, consequential, and compensatory damages.

95.     Defendant's conduct was the proximate cause of Plaintiff's injuries, damages, and losses.

### THIRD CLAIM FOR RELIEF
### (Violation of Section 504 of the Rehabilitation Act of 1973
### 29 U.S.C. §§794 *et. seq.*)

96.     Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

97.     Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, *et. seq.* ("Section 504") prohibits discrimination against disabled individuals.  As alleged above, the Plaintiff has a disability in the form of sleep apnea which resulted in symptoms such as severe and debilitating fatigue, severe headaches, high blood pressure, and anxiety.

98.     Section 504 prohibits any program or activity that receives federal financial assistance from engaging in employment discrimination against qualified individuals with disabilities.

99.     Defendant is the recipient of federal financial assistance and Section 504 applies to the University of Denver.

100.    The Plaintiff is a qualified employee who can perform the essential functions of his Senior Database Administrator position with or without a reasonable accommodation.

101.    As alleged above, the Plaintiff on numerous occasions in March 2017 requested a reasonable accommodation in only working a standard work week of 37.5 hours with no after hours work or on-call work.  The Plaintiff requested that this

accommodation only last until August 2017 when he returns from his surgery to correct his sleep apnea.

102.    The Defendant refused to provide Plaintiff with a reasonable accommodation and claimed that Plaintiff's request to only work his standard work week would cause an undue hardship on its' EAS department.

103.    The Defendant violated Section 504 when it terminated the Plaintiff because of his disability and for its' refusal to provide him with a reasonable accommodation.

104.    The Defendant's practices were intentionally discriminatory and were taken with deliberate indifference to the strong likelihood that their practices would result in the violation of Plaintiff's federally protected rights to work without being discriminated against because of his disability.

105.    As a direct and proximate cause of the Defendant's violation of Section 504, the Plaintiff has suffered from significant economic, consequential, compensatory damages, injuries, and losses in amounts that will be proven at trial.

## FOURTH CLAIM FOR RELIEF
### (Retaliation in Violation of Section 504 of the Rehabilitation Act of 1973; 29 U.S.C. §§794 *et. seq.*)

106.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

107.    The Rehabilitation Act's anti-retaliation provisions mirror the anti-retaliation laws contained in the ADA, 42 U.S.C. §12203 (a).

108.    When the Plaintiff was notified by his doctor that working in excess of 37.5 hours; working after hours; and working on call aggravated the symptoms caused by his sleep apnea, he made a request for a reasonable accommodation to adjust his work schedule until he completed his surgery in August 2017.

109.    The Plaintiff's made numerous requests for a reasonable accommodation between March and July 2017.   Plaintiff made these requests for a reasonable accommodation under his good faith belief that he was disabled.

110.    The Plaintiff's numerous requests for a reasonable accommodation constitutes a protected activity under the Rehabilitation Act.

111.    The Defendant's decision to terminate the Plaintiff qualifies as an adverse employment action under the Rehabilitation Act.

112.    The Defendant's decision to terminate the Plaintiff less than three months after he engaged in a protected activity is the temporal proximity required to show that his termination was in retaliation for engaging in a protected activity.

113.    The Defendant's retaliation against the Plaintiff for exercising his rights under the Rehabilitation Act has caused the Plaintiff to suffer significant economic, consequential, compensatory damages, injuries, and losses in amounts that will be proven at trial.

## FIFTH CLAIM FOR RELIEF
### (Retaliation in Violation of Title VII of the Civil Rights Act of 1964 42 U.S.C. §2000e *et. seq.*)

114.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

115.    Plaintiff engaged in activities and speech in opposition to the employment practices prohibited by Title VII by speaking out and opposing the Defendant's discriminatory practices.

116.    Based on information and belief, another employee in the EAS filed a complaint of discrimination against the Defendant in early 2017.

117.    In May 2017, the Plaintiff was contacted by an investigator to schedule an interview.   Plaintiff expressed his concern that he would be retaliated against by the Defendant if they found out he gave an interview in connection with this investigation.

118.    On or around 22 June 2017, Plaintiff gave an interview to the investigator, Christina Valencia.   During this interview, Plaintiff again expressed his concern that he would be retaliated against by the Defendant for participating in this interview.   Despite his fears, the Plaintiff cooperated with the investigator and agreed to be interviewed.

119.    Approximately three weeks later, the Defendant terminated the Plaintiff on 12 July 2017.

120.    Upon information and belief, Plaintiff believes that the Defendant was aware that Plaintiff participated in the discrimination investigation initiated by his co-worker before it made the decision to terminate him.

121.    Defendant's retaliatory conduct was engaged in with malice and reckless indifference to the Plaintiff's federally protected rights within the meaning of Title VII.

122.    The retaliatory employment practices, and other acts or omissions of the Defendant and its Director and managers, reflect Defendant's reckless and wanton

indifference or hostility to Plaintiff's protected employment rights and status, directly and proximately resulting in such damages as may be proven at trial.

## SIXTH CLAIM FOR RELIEF
### (Interference with Plaintiff's Right to Leave Under the Family Medical Leave Act 29 U.S.C. §2601 *et. seq.*)

123.    Plaintiff hereby incorporates all paragraphs of this Complaint as though fully set forth herein.

124.    Defendant is a covered employer as defined by the Family Medical Leave Act ("FMLA"); 29 U.S.C. §2601, *et. seq.*

125.    The Plaintiff is an eligible employee as defined by the FMLA.

126.    The FMLA makes it unlawful for the Defendant "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right protected" under the Act; 29 U.S.C. §2615 (a)(1).

127.    The FMLA grants an eligible employee a total of 12 workweeks of leave during any 12-month period if the employee is unable to perform the functions of his position due to a serious medical condition; 29 U.S.C. §2612 (a)(1)(D).

128.    Plaintiff's sleep apnea qualifies as a serious medical condition under the FMLA.

129.    From 02 through 27 March 2017, the Defendant granted the Plaintiff's request for continuous leave under the FMLA.

130.    On 07 April 2017, the Plaintiff emailed Mr. Moore for information on how he could take intermittent leave under the FMLA.

131.    Upon information and belief, Mr. Moore immediately contacted Ms. Ananthakrisnan and told him about Plaintiff's request.

132.    On 10 April 2017, Ms. Ananthakrisnan suddenly requests a meeting with Plaintiff and demanded that he inform her about any additional leave.

133.    Mr. Moore never did provide the Plaintiff with any information on how he could apply for intermittent leave under the FMLA.

134.    Ms. Ananthakrisnan's sudden demands about information connected to Plaintiff's request for intermittent leave, coupled with Mr. Moore's refusal to provide Plaintiff information about taking intermittent leave, discouraged the Plaintiff from taking protected leave under the FMLA.

135.    Had Defendant authorized Plaintiff's request for intermittent leave under the FMLA, any leave taken pursuant to his August 2017 to correct his sleep apnea would have been protected by federal law.

136.    Plaintiff's communications with Mr. Moore and Ms. Ananthakrisnan provided the Defendant with the requisite notice on the need to take intermittent leave under the FMLA.

137.    The Defendant's actions are the direct and proximate reasons why the Plaintiff did not pursue his request for intermittent leave under the FMLA.

138.    Defendant's interfered with the Plaintiff's federally protected rights within the meaning of FMLA.

139.    The Defendant's interference with the Plaintiff's FMLA rights has caused the Plaintiff to suffer significant economic, consequential, compensatory damages, injuries, and losses in amounts that will be proven at trial.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor against Defendant, and award him all relief as allowed by law, included, but not limited to the following:

a.    Declaratory relief and injunctive relief, as appropriate;

b.    Actual economic damages as established at trial;

c.    Any economic losses or injuries that Plaintiff has suffered to the present time or which Plaintiff will probably suffer in the future, including but not limited to loss of earnings or damage to his ability to earn money in the future, and other expenses;

d.    Compensatory damages, including, but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

e.    Punitive damages for all claims as allowed by law in an amount to be determined at trial;

f.    Pre-judgment and post-judgment interest at the highest lawful rate;

g.    Attorney's fees and costs; and

h.    Such relief as justice requires.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Dated this 11th day of November 2019

<u>*s/ Christopher M.A. Lujan*</u>
Christopher M.A. Lujan, Esq.
Empower P.C
2851 South Parker Road, Suite 316
Aurora, Colorado 80014
720.791.5700 (Office)
720.260.1802 (Mobile)
christopher@empowerlawdenver.com

Attorney for Plaintiff